Argument, that's United States v. Elijah Ward, if I'm pronouncing it right. Thank you. Good morning, may I please Wait, wait, let's don't start yet. We've just changed gears for a second. Mr. Brandon, you have not reserved any time for rebuttal. Mr. Spooky has, right? That's correct. Okay. I represent Lajaward Khan. I'll call him Mr. Khan for space purposes. Okay, that's helpful. Thank you. This is essentially a sentencing appeal in which I've raised three claims of error with regard to base offense level, with regard to role, and ultimately the sentence that was imposed. With regard to drug weight, the application notes to 2D1.1 of the guidelines make clear that to the extent a defendant can show that despite the agreement he made, he was not able or willing or intending to distribute the amount of drugs, then that amount of drugs should be reduced from the overall level. Here we had a FATICO hearing at which Mr. Spooky's client, Mr. Saeed, testified. My client filed a declaration and he also proffered. I think the totality of the evidence put forward on that record shows that these defendants, in fact, never intended to distribute 100 kilos of heroin. Mr. Khan, my client, barely scraped together a 3-kilo sample, which was of subpar quality. He had promised super quality white heroin. He gave 67 percent pure heroin that was brown. Your client proffered, right, in which he did say that he had the ability and the intention to sell 100 to 200 kilograms of heroin, right? He indicated that if he was required to do so, but that assumes that he was, plan A was. Well, he was talking about it. He's on, right, he's on tape talking about large quantities. And then in a proffer, he says that, well, all right, there are recordings about the capacity to sell large quantities by this conspiracy, right? From Mr. Saeed, correct. All right. But so the tapes get you there, but you're saying, well, that was puffery, that was just talk. But there's then the proffer in which your client confirms that they could do this, right? He could. If required to. I mean, I don't know what that means, but the fact is that he could. I think that's not a good fact for my argument, but I think that the greater abundance of facts compels the conclusion that they really never intended to do it at all. He indicated in the proffer that if he had to do it, maybe he could get Naguib to do it. But their real point was they were going to try and rob U.C. Omar of a down payment on the wholesale amounts when they arrived in Bangkok, as well as to get paid on the profits from the sample, the 3 kilos that they had earlier distributed. I think on balance, the record shows it's favorable to the defendants more so than it is to the government with regard to weight. Secondly, with regard to role, Mr. Khan, on this record, did not supervise or manage anyone. There are seven possible people that were suggested by the government, I think, during the Fatico proceedings. Mr. Saeed was his partner, so he was not managing Mr. Saeed. But there was somebody named Salamat who your client ---- Yeah. Salamat was like a ---- Well, who was recruited, I mean, I think, according to what drawn the inferences in favor of the ---- He was known to be a freelance errand runner. Mr. Khan paid him and said ---- He recruited him and he directed him to pick up and deliver drugs in Afghanistan, right? In Afghanistan? Yes, this was in Afghanistan. Yeah. Salamat, in a way, directed Mr. Khan more than Mr. Khan directed him. Salamat provided the source of drugs, which could be Gaffar, with whom Mr. Khan could negotiate a price. Salamat said that he would, in fact, take control of the heroin and make the conveyance to the undercover back in the capital city. And he's the one that came up with the plan to hide the heroin under the tomatoes. So as the way it all functioned ---- He's the man on the ground, right? And he's the one that seemed to have the inside knowledge about how this could actually come off. So I think, again, with regard to Salamat, that while you've probably pointed to the number one person among the seven that I was going to speak about, I still think that it doesn't show that Mr. Khan had any supervisory or managerial role vis-a-vis him. Their relationship was very short-lived, as I've noted. And Salamat, again, seemed to control Khan with regard to logistics. Finally, with regard to substantive unreasonableness of the sentence, I will just note briefly that the Probation Department recommended a 10-year term of imprisonment here. We, of course, sought that same term because that was the mandatory minimum. I think that Probation probably came to that conclusion that that would be an appropriate sentence. Based on Mr. Khan's life, he was born into poverty. He stepped into his father's business, which was not an especially lucrative one. The Taliban essentially ruined that business. He had nine kids, two wives to take care of. Where he was, heroin distribution is big business. So I'm not applauding him for getting involved, but I think under his circumstances, it was out of necessity that he got involved in the drug trade. I will note that the numbers were so high in this case because the government ran up those numbers. Mr. Khan was a victim of a sting, and no drugs ever came into this country. And you made these arguments, and certainly Judge Wood reviewed the submissions, which developed a lot of things you've just mentioned, right? Mm-hmm. And then she sentenced him below the guidelines, just not as far as what Probation recommended. She did. But a guideline sentence can still be deemed unreasonable. I think she abused her discretion in not going down farther. All right. Thank you, Mr. If I may, I have an unusual request. I have to be in Central Iceland by 1.30. Oh. So I didn't reserve rebuttal time. These two know I respect them, that I'm not walking away because I don't want to hear what they have to say. But if I'm permitted to leave, I would like to. That's fine. All right. Thanks very much. Mm-hmm. All right. And now we'll hear from Mr. Spilkey, who's here for the duration. That's right, Your Honor. And may come back for more. So you reserved a minute for rebuttal. Go ahead. That's right. Good morning, still. Yeah. Let me go to the heart of my argument in my limited time available, which is that the district court's factual findings were not made with sufficient clarity to permit appellate review, and that on that basis, this court must remand for resentencing. With respect to what? Now, that's with respect to the denial of safety valve under 3553F5. Judge Wood left – Judge Wood's finding was so general that it leaves us only to guess what the basis of the denial was. I didn't find it that cryptic. It seemed to me that your client was denying that he had the ability to move the kind of weight that was discussed in the conversations that were recorded. There was a fatico about that, and she found that, no, your client and Mr. Brandon's client are both on the hook for the full weight, which is over 90 kilos. And so that would then lead to the conclusion that she didn't credit the statements about his lack of intent or ability, right? Well, Your Honor, there were the fatico hearing, which was originally, initially meant to address only the issue of my client's role, and the portion with regard to Mr. Lajuard Khan, I imagine, would have dealt with Mr. Lajuard Khan's role, ended up becoming wide-ranging. The district court, Sua Sponte, made us aware that the fatico – that she intended the fatico hearing to be about all matters relevant to sentencing. So Mr. Said's testimony was wide-ranging and went to everything, his whole life, his role in the crime, his alleged supervisory role, which Judge Wood eventually found did not apply. So the – At the very least, she did not credit his testimony about his inability or lack of intent to move over 90 kilos of heroin, right? Well, I'm not sure about that. Well, she concluded that the base offense level was 38, so I guess she didn't credit it. Well, Your Honor, I do part ways somewhat with Mr. Lajuard Khan in that – and I was asked this directly by Judge Wood at sentencing whether Mr. Said, my client, was because it was – Well, at the actual sentencing, that was true. Well, he had always maintained that. He had always – I had – Judge Wood had earlier, before sentencing, issued an order asking for clarification on that point, and Mr. Said, through counsel, submitted a letter answering that there was a plan A. Plan A was to abscond with the money. Plan B was to produce the 90 kilograms, approximately 90 kilograms, by hook or by crook and give it to the undercover. And that was his position all along. So it was not just at sentencing. But at sentencing, the district court was still under – appeared to be under the misimpression that he was disclaiming responsibility for more than the 3-kilogram sample. And I explicitly said, no, that's – his position all along has been that he claims responsibility for all 90 kilograms. Is that still the position? That's still the position, Your Honor, because it's – it was reasonably foreseeable. And I do differ from Mr. Lajuard Khan in that respect. However, the – I was asking for a very – a downward variance on the basis that it was so difficult for them to pull together just even the 3-kilogram sample that these – that it showed that my client and his partner were not the sophisticated international drug dealers that – that they were – that the government seemed to think that they were. So I just want to point out that the district court in denying safety valve said only the following. Quote, much of Mr. – and this is actually not a direct quote. I did – I – for clarity, I had to change it somewhat. But much of Mr. Syed's testimony on important aspects, plural, of the crime were not truthful. And that just leaves – that just left me to guess what the basis was. And it was very – it was almost impossible for me to argue against the government's allegations that my client had fabricated his testimony. Unless the Court has questions for me, I do see I'm over my time. All right. Thank you, Mr. Smith. You've got a minute for rebuttal. We'll hear from Ms. Donaleski for the government. May it please the Court. My name is Rebecca Donaleski. I'm an assistant United States attorney in the Southern District of New York. I represent the United States on appeal, and I also represented the United States in the proceedings below. The defendants were large-scale international heroin traffickers whose sentences were both procedurally and substantively reasonable, and the Court should affirm those sentences. I'd like to briefly respond to the points raised by counsel here today. I want to start with the last point by Mr. Spooky about the – whether Judge Wood made a sufficient record about failure to meet the conditions or the criteria for the safety valve. Absolutely, Your Honor. I mean, it's really just truthfulness, right? That's the basis for denying the safety valve. Exactly right, Your Honor. In fact, Judge Wood even talked about maybe there should be an enhancement for obstruction because she deemed the testimony at the Fatico to be perjury. She did. She didn't make a specific finding about that, right? Or did she? She noted – she found that Said's testimony was, quote, fabricated. And what – But usually for a perjury, you've got to be more specific. I mean, so generally, if somebody makes false statements on the stand at a trial or in a Fatico hearing, the Court is going to have to sort of back that up with some findings about what the statement was and that it was false and intentionally false. But that didn't happen here. That didn't happen. But she didn't – she didn't, to be fair, impose an enhancement for obstruction or perjury. That's correct, nor was she asked to. And so to respond to Your Honor's point about whether her factual findings were sufficient, they were. What counsel is doing here is noting one particular sentence in a multi-page transcript sentencing proceeding. And as Judge Sullivan, you noted earlier in your questioning, Judge Wood noted she made a finding that Lodgeward's proffer statement was credible. She made a finding that Lodgeward's statement that the defendants intended to, had the capacity to supply the undercover with 100 kilograms of heroin, she found that that was credible and that Lodgeward didn't have any incentive to overstate their abilities in the proffer. The entire crux of Saeed's testimony was whether or not he had the capacity and intention to produce these 100 kilograms of heroin or whether he – his belated self-serving story about Plan A, Plan B disappearing into the tribal areas of Pakistan was, in fact, the truth. And Judge Wood made clear that she found Lodgeward's proffer statements, which were, of course, backed up by numerous recorded interactions and meetings and calls between Saeed and the undercover, she found those to be credible and she found Saeed's testimony to be, quote, at odds with Lodgeward's proffer statement and fabricated. So on that basis, it's clear from the proceedings below that throughout the sentencing proceeding, Judge Wood gave feedback to defense counsel and to the government about what she found to be credible and supported by the evidence and what she did not find to be credible. So it's not so much that there are specific statements by Mr. Saeed that were untrue. It's that the whole story was inconsistent and therefore not credible. That's exactly right. What Judge Wood found is that as to the crux of the issue, whether he was truthful about whether he intended to supply the 100 kilograms of heroin, she found that to be not supported by Lodgeward's proffer and inconsistent with the other evidence that she found to be credible. I'll also note that Judge Wood also made clear that she adopted the government's argument with respect to Saeed's truthfulness and the government submitted numerous sentencing arguments and briefs in advance of the proceeding related to this issue. And her adoption of the government's argument also provides a further factual basis for her finding. If there's anything else on safety valve, I'll proceed to Lodgeward's argument with respect to drug weight. Okay. So I'd like to point to three pieces of evidence in the record that amply supported Judge Wood's finding as to drug weight. First, during two recorded meetings in January and in April, Saeed explicitly agreed to provide the undercover with 100 kilograms of heroin. Saeed said it was, quote, not that much and said that he could provide up to 1,000 kilograms of heroin to supply the undercover. Critically, this was corroborated by Lodgeward's credible proffer statement where he described the fact that he and Saeed were drug trafficking partners. They had previously sent approximately 100 kilograms of heroin hidden in the stomachs of couriers to India. These were established international drug traffickers who had no problem sourcing heroin in Afghanistan and supplying it internationally. With priors. Is that correct? They had prior convictions or no? They did not, Your Honor. Lodgeward told the government that he intended to provide 100 kilograms of heroin to the undercover. And he also described in his proffer statement that the entire point of the 3-kilogram sample was to get a larger deal. That's a direct quote from his proffer statement. 3-kilogram sample? Yes. That's a pretty big sample. Your Honor is exactly right. Only in the world of significant international heroin traffickers is 3 kilograms of heroin, which is an enormous quantity of drugs, considered a sample. So given all of these points in the record, it was certainly not clear error for a judge Wood to find that the defendants, and particularly Lodgeward, intended to supply 100 kilograms of drugs and that the drug weight should be level 38. Unless Your Honors have any questions on leadership or on the substantive reasonableness of the sentence, which I'm happy to speak to, we'll rest on our feet. The leadership, it seems to me, your contention is just Salamat is the person recruited and directed by Mr. Khan and that's enough. Exactly right, Your Honor. More than, Judge Wood found six or more people were involved in the conspiracy. Well, she found that it was both otherwise expensive and that Lodgeward had supervised Salamat. And directly quoted from Lodgeward's proffer statement, he directed Salamat to the undercover in Kabul. Right. How many people were in this conspiracy that the government's arguing? Your Honor, we noted. More than five or not? Yes. We noted more than five. And I will note that Lodgeward discussed each of these five participants in his proffer statement. Himself, his brother Habibullah, Saeed, Salamat, the two individuals in. I counted six. Is that what you're counting or do you have a different number? Yes. We're arguing that it's at least five participants. We argue that six were involved. And, of course, United States v. Jacobo, which Judge Kearse wrote, stands for the proposition that the defendant's management of at least one participant, including a courier in that case, was sufficient to support the application of the leadership enhancement. Okay. Thank you. Thank you, Your Honors. Okay. Mr. Spooky, you've got a minute. Thank you, Your Honor. So, Mr. Spooky, maybe I want to just start with your brief, because maybe I was confused about this. But the last point in your brief says that your client joins in the brief of Mr. Kahn, including with respect to substantive unreasonableness. Mr. Kahn also makes a point about drug weight. You're not joining that one or you are joining that one? I'm not. You're not. I should make that clear. Yes, Your Honor. I'm joining the substantive reasonableness argument. Just that one? Yes, Your Honor. Okay. And so if I could just respond to a couple of my colleagues' questions or answers, rather. So the government notes faults, Mr. Syed, for only noting one sentence in the entire proceedings, and that's because that's all there is. The government can't point to an explicit finding of fact or an explicit adoption of the government's arguments. So you can scour the record, but you'll find no explicit statement in that regard. I'm trying to decipher my writing. Well, let's just see. The inconsistency, the alleged inconsistency, between Lajeward's proffer and the so-called self-serving statement about Plan A and Plan B. I would point out that in Lajeward's proffer, Lajeward Conn, he says that if they had to provide the undercover with the larger shipment, that they would employ the services of a gentleman named Nakib. The operative word is if, and that's at Lajeward's appendix, page 73. This wasn't a late arriving argument. Mr. Syed made this argument in his initial affidavit, which he submitted to the government to satisfy the disclosure requirement of 3553F, because the government declined to meet with Mr. Syed for a safety valve proffer. One last point is that the government talks about my client promising that he could get 1,000 kilograms of heroin. That's a metric ton. My arguments about why that's not possible and why that's clearly puffing are in blue brief pages 13 to 14. Unless you have no further questions, thank you very much. Okay. Thank you, Mr. Spilkey, Ms. Donelaski, and Ms. Scott, for all you do. All right. We will reserve decision on the one remaining case that's on our calendar. Thanks very much. Have a nice Thanksgiving. We're adjourned.